**DOLL AMIR & ELEY LLP**
HUNTER R. ELEY (SBN 224321)
heley@dollamir.com
CHELSEA L. DIAZ (SBN 271859)
cdiaz@dollamir.com
1888 Century Park East, Suite 1850
Los Angeles, California 90067
Tel: 310.557.9100
Fax: 310.557.9101

Attorneys for Defendant
REGAL MEDICAL GROUP, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHAMAD PINCHEM,<br><br>Plaintiff,<br><br>v.<br><br>REGAL MEDICAL GROUP, INC.,<br><br>Defendant. | Case No. 2:15-cv-06518-ODW-KLS<br><br>*Assigned to Judge Otis D. Wright, II*<br>*Referred to Magistrate Judge Karen L. Stevenson*<br><br>**DEFENDANT REGAL MEDICAL GROUP, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>*[Filed concurrently herewith: Statement of Uncontroverted Facts; Declaration of James Haggard; Declaration of Dania Sanchez-Pinnick; Declaration of Hunter Eley; and [Proposed] Judgment]*<br><br>Date:            November 14, 2016<br>Time:            1:30 p.m.<br>Courtroom:  11, Spring Street Level<br>Location:      312 N. Spring Street<br>                      Los Angeles, CA 90012<br><br>Complaint Filed:   August 26, 2015<br>Trial Date:            January 31, 2017 |

DOLL AMIR & ELEY LLP

**TO EACH PARTY AND COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on Monday, November 14, 2016 at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 11 of this Court, located at 312 N. Spring Street, Los Angeles, CA 90012, Spring Street Level, Defendant Regal Medical Group, Inc. ("Regal"), will and hereby does move for summary judgment, or in the alternative, partial summary judgment, of the one cause of action in Plaintiff Ashamad Pinchem's ("Plaintiff") Complaint.

This Motion is made pursuant to Federal Rule of Civil Procedure 56, on the ground that Plaintiff Ashamad Pinchem cannot prevail on his sole cause of action for violation of the Telephone Consumer Protection Act ("TCPA").  Plaintiff has failed to produce, and cannot obtain, evidence sufficient to create a triable issue of fact as to this claim for two reasons.

First, as a matter of law, the TCPA does not apply to the facts of this case because the record is undisputed that there were no unsolicited advertisements sent via facsimile.

Second, the undisputed material facts demonstrate that significant human intervention was required to generate correspondence and attempt to send it via facsimile to Regal's contracted medical provider, Dr. Cindy Huang.  The attempted faxes fall into three categories:  (1) 420 letters sent in response to medical authorization requests made by Dr. Huang and requiring an in-depth analysis by Regal; (2) 80 routine letters in response to medical authorization requests made by Dr. Huang that met criteria to allow for an immediate response; and (3) 26 letters sent to Dr. Huang in her capacity as a healthcare provider contracted with Regal.  In each case, human intervention was required such that the TCPA definition of an automatic telephone dialing system does not apply as a matter of law.  As a result, summary judgment should be granted in favor of Regal.  In the alternative, partial summary judgment should be granted as to one or more of the categories of correspondence Regal attempted to send to Dr. Huang.

DOLL AMIR & ELEY LLP

1    This Motion is made following the conference of counsel pursuant to L.R. 7-3,

2  which took place in person on September 15, 2016 in Los Angeles, California after an

3  extensive written exchange and a prior settlement conference on May 10, 2016.

4  (Declaration of Hunter Eley, ¶ 2.)

5    This Motion is based on the Notice of Motion, the attached Memorandum of

6  Points and Authorities, the declarations of Hunter Eley, James Haggard and Dania

7  Sanchez-Pinnick, the reply papers to be submitted in this matter, and such additional

8  evidence as may be submitted at the hearing of this matter.

9

10   DATED:  October 12, 2016          **DOLL AMIR & ELEY LLP**

11                                     By: */s/ Hunter R. Eley*             .

12                                        HUNTER R. ELEY
                                          CHELSEA L. DIAZ

13                                      Attorneys for Defendant,
                                        REGAL MEDICAL GROUP, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOLL AMIR & ELEY LLP

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................. 1

II.  STATEMENT OF UNDISPUTED FACTS .................................................. 3

    A.   As An Independent Practice Association, Regal Routinely Communicates With Healthcare Providers Regarding Patient Care. ... 3

    B.   Regal Reviews, Packages, Decisions and Responds To Medical Authorization Requests. ......................................................... 3

        1.   The Healthcare Provider Submits A Medical Authorization Request. ................................................................. 4

        2.   Regal Reviews The Medical Authorization Request ................. 4

        3.   Regal Responds To The Medical Authorization Request. ......... 5

        4.   Regal Uses adTempus and XMedius To Transmit Responses to Medical Authorization Requests Via Facsimile. ......................................................................... 6

    C.   Regal Inadvertently Transmitted Facsimiles To Plaintiff's Cell Number. ............................................................................... 7

        1.   Regal Responded to Hundreds of Medical Authorization Requests from Dr. Huang. ....................................................... 7

            i.   Regal Responded to Most of the Requests Only After Review by the Medical Management Team. ............ 7

            ii.   Regal Responded Instantaneously To Some Requests Submitted By Dr. Huang. ........................................... 8

        2.   Separate And Apart From The Medical Authorization Responses, Regal Employees Also Attempted to Fax A Limited Number Of Communications Directly To Dr. Huang. ................................................................................ 8

    D.   The Numerous Successful Transmissions Prevented Regal From Identifying The Cell Number As Invalid. ............................... 9

    E.   Plaintiff Made Only A Single Attempt To Notify Regal. .................... 9

III.  LEGAL STANDARD ........................................................................ 10

IV.  ARGUMENT ................................................................................. 10

    A.   The Telephone Consumer Protection Act ........................................ 10

        1.   An ATDS Requires The Ability To Dial Numbers Without The Need Of Human Intervention. ............................. 11

iii

DOLL AMIR & ELEY LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOLL AMIR & ELEY LLP

B.   Regal's Conduct Falls Outside The Scope Of The TCPA.................14

1.   Regal Did Not Send Unsolicited Advertisements By Facsimile To Plaintiff. .................................................14

2.   Regal's Process For Sending Facsimiles Is Not An ATDS Because Significant Human Intervention Was Required To Generate The Correspondence And Attempt To Send It To The Intended Medical Provider. .................................16

a.   Response Faxes to Medical Authorization Requests Made By Dr. Huang .......................................17

(i)   Requests That Require In-Depth Analysis...........18

(ii)   Requests Allowing For A Routine Response ......19

b.   Direct Faxes Intended For Dr. Huang ..........................21

3.   Mere Repeat Dialing Is Insufficient To Bring A System Under The TCPA .......................................................22

V.   CONCLUSION .............................................................23

DEFENDANT REGAL MEDICAL GROUP, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1

# TABLE OF AUTHORITIES

Page

## CASES

*BFP v. Resolution Trust Corp.*,
    511 U.S. 531 (1994) ................................................................... 15

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................. 10

*Derby v. AOL, Inc.*,
    2015 WL 3477658, at *4 (N.D. Cal. 2015) ................................ 12, 18, 21, 23

*Dominguez v. Yahoo, Inc.*,
    2015 WL 6405811, at *2 (3d Cir. 2015) ................................... 10, 11

*Estrella v. Ltd. Fin. Servs., LP*,
    2015 WL 6742062, at *1 (M.D. Fla. 2015) ............................... 11, 12

*Flores v. Adir International, LLC*,
    2015 WL 4340020 (C.D. Cal. 2015) ........................................ 13

*Gaza v. LTD Fin. Servs., L.P.*,
    2015 WL 5009741, at *4 (M.D. Fla. 2015) ............................... 12

*Glauser v. GroupMe, Inc.*,
    2015 WL 475111, at *6 (N.D. Cal. 2015) ................................. 14

*Gragg v. Orange Cab Co., Inc.*,
    995 F. Supp. 2d 1189 (W.D. Wash. 2014) ............................... 12, 20

*Jenkins v. mGage, LLC*,
    2016 WL 4263937, at *5 (N.D. Ga. 2016) ................. 12, 13, 14, 18, 19, 22

*Johnson v. Yahoo!, Inc.*,
    2014 WL 7005102, at *5 (N.D. Ill. 2014) ................................. 13, 18, 21

*Legg v. Voice Media Group, Inc.*,
    20 F.Supp.3d 1370 (S.D. Fla. 2014) ....................................... 10, 11

*Lozano v. Twentieth Century Fox Film Corp.*,
    702 F. Supp. 2d 999 (N.D. Ill. 2010) ...................................... 15

*Luna v. Shac, LLC*,
    122 F.Supp.3d 936 (N.D. Cal. 2015) ...................................... 12, 18

*McKenna v. WhisperText*,
    2015 WL 428728 (N.D. Cal. 2015) .......................................... 14, 20, 21

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ............................................... 10

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DOLL AMIR & ELEY LLP

DEFENDANT REGAL MEDICAL GROUP, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

*Nunes v. Twitter, Inc.*,
       2014 WL 6708465, at *1 (N.D. Cal. 2014)....................................................11

*Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*,
       781 F.3d 1245 (11th Cir. 2015)..........................................................16

*Satterfield v. Simon & Schuster, Inc.*,
       569 F.3d 946 (9th Cir. 2009)......................................................10, 15

*Sterk v. Path, Inc.*,
       46 F.Supp.3d 813 (N.D. Ill. 2014) ...............................................12

*Wattie-Bey v. Modern Recovery Solutions*,
       2016 WL 1253489, at *4 (M.D. Pa. 2016).............................14, 22

*West Coast Truck Lines, Inc. v. Arcata Community Recycling Center, Inc.*,
       846 F.2d 1239 (9th Cir. 1988).....................................................15

## **STATUTES**

47 U.S.C. § 227(a)(1) ...............................................................11

47 U.S.C. § 227(b)(1)(A)(iii).....................................................11, 15, 16

47 U.S.C. § 227(b)(1)(C) .....................................................11, 14, 15, 16

47 U.S.C. § 227(b)(2) ...........................................................11

DOLL AMIR & ELEY LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Regal Medical Group, Inc. ("Regal") respectfully submits this memorandum of points and authorities in support of its Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment, on the Complaint of Plaintiff Ashamad Pinchem ("Pinchem").

## I.   INTRODUCTION

By this lawsuit, Plaintiff seeks to expand the scope of the Telephone Consumer Protection Act ("TCPA") far beyond any reasonable or common-sense boundaries. This case does not involve telemarketing calls randomly dialed in rapid succession. It does not involve debt collection calls sequentially dialed from a list of delinquent account holders. It does not involve unsolicited advertisements unscrupulously transmitted via facsimile. This case bears no resemblance to the wave of litigation that has swamped federal courts throughout the country in the past few years.

In stark contrast to those cases, this case involves 500 different letters that Regal attempted to send via facsimile to Dr. Cindy Huang, a medical provider, over a two-year period. Regal is in the business of arranging for the care of health plan members. Dr. Huang, one of Regal's contracted physicians, submitted more than 300 requests for authorization to perform medical services. Upon receipt, Regal would send response letters either approving or denying the request, depending on the facts of the case and the diagnosis of the patient. In some instances, Regal employees would respond with letters requesting more information. Regal attempted to communicate these responses to Dr. Huang by facsimile.

However, through inadvertence, Regal incorrectly entered Dr. Huang's facsimile number into its system, resulting in the placement of Plaintiff's cellular number instead. The result of this error was that numerous facsimile transmissions were inadvertently sent to Plaintiff's cellular number. Regrettably, Plaintiff's only purported attempt to alert Regal to the problem by placing a single (indeed, unmemorable) call was insufficient, and the calls continued for nearly two years.

1

1  Instead, Plaintiff avoided the disruption by blocking Regal's number, keeping the cell

2  phone turned off or simply not answering the calls.  Regal has since corrected this

3  error.

4      Yet, with this inadvertence, Plaintiff seeks to obtain a financial windfall by

5  stretching the facts of this case into a violation of the TCPA—an Act designed to

6  address telemarketing abuse against the general consuming public.  Seeking to avail

7  himself of the draconian penalties provided by the Act, Plaintiff claims entitlement to

8  nearly $9 million dollars in statutory penalties for being the unintended recipient of

9  these failed fax transmissions.

10     Plaintiff's efforts must be rejected.  *First*, the only section in the TCPA

11  regulating facsimile transmissions pertains to *advertisements* by facsimile, which are

12  undisputedly not at issue here.  Although Plaintiff relies on other sections of the Act

13  pertaining to "calls", those sections are inapplicable.  Congress plainly understood the

14  distinction between faxes and calls (writing separate sections for each), and had

15  Congress intended to have the provisions regulating "calls" also apply to faxes, it

16  would have done so.

17     *Second*, even if the section regulating "calls" was applicable, Plaintiff's TCPA

18  claim must fail because Plaintiff cannot show that the transmissions sent to Plaintiff's

19  phone were sent using an "automatic telephone dialing system" ("ATDS") as required

20  by statute.  Namely, an ATDS requires that calls to consumers be made without

21  human intervention—in other words, the calls must be made without human oversight

22  or control.  However, considering that Regal's response letters required significant

23  human oversight—including, but not limited to, diagnosing specific patients,

24  justifying specific medical procedures for that patient, and analyzing requests to

25  perform those procedures, all before a transmission is even sent by Regal—Regal's

26  alleged misconduct plainly falls outside the scope of an ATDS, and Plaintiff's claim

27  must be rejected on this basis as well.

28     For these reasons and more, Plaintiff's attempt to stretch his claim into a TCPA

DOLL AMIR & ELEY LLP

2

violation—and attempt to gain a windfall through statutory penalties—must be rejected, and summary judgment must be granted in Regal's favor.  Alternatively, Regal requests that this Court enter partial summary judgment on Plaintiff's claims, as set forth below in greater detail.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   As An Independent Practice Association, Regal Routinely Communicates With Healthcare Providers Regarding Patient Care.

Regal is an independent practice association which arranges and pays for the provision of medical care to members of healthcare plans known as Health Maintenance Organizations or HMOs.  (Statement of Uncontroverted Facts ("SUF") 1.)  To arrange for that medical care, Regal contracts with more than 2,100 primary care physicians and 5,000 specialists.  (SUF 2.)  As a result, one of Regal's primary functions is to communicate with healthcare providers and authorize or deny medical services for its members.  (SUF 3.)

### B.   Regal Reviews, Packages, Decisions and Responds To Medical Authorization Requests.

When a patient (who is a member of an HMO that has contracted with Regal to arrange for his or her medical care) requires certain healthcare services, the healthcare provider treating that member (e.g., the patient's physician) seeks authorization from Regal for those services to be performed.  (SUF 10.)  Regal employs a staff of coordinators, nurses and doctors, known as the Medical Management Team, to then review and respond to the medical authorization requests received.  (SUF 11.)  The type of response and the speed in which Regal responds to a medical authorization request depends on the particular circumstances of the request.  (SUF 12.)  There are some requests that Regal decisions and responds to almost instantaneously.  (SUF 13.)  There are others that require a significant review by Regal's Medical Management Team.  (SUF 13.)  This was the case in September 2013 and remains the case today.  (SUF 14.)  Specifically, since at least September 2013, Regal has utilized

3

DEFENDANT REGAL MEDICAL GROUP, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

DOLL AMIR & ELEY LLP

the following process to receive and respond to medical authorization requests:

### 1.    The Healthcare Provider Submits A Medical Authorization Request.

Every medical authorization request received by Regal begins with a healthcare provider manually requesting authorization from Regal for a healthcare service to be provided to a patient.  (SUF 15.)  In submitting an authorization request, the provider identifies the patient and describes the diagnoses of the patient, the medical services requested and the reasons for the request.  (SUF 16.)  There are three different methods that providers use to submit medical authorization requests to Regal.  (SUF 17.)  Primarily, providers submit medical authorization requests to Regal directly through Regal's internet-based portal known as "Regal Express Access," "REA" or "Access Express" (collectively referenced herein as "REA")—which essentially provides an interface between the healthcare provider and Regal.  (SUF 18.)  However, providers also submit medical authorization requests by phone or fax.  (SUF 19.)  When Regal receives a medical authorization request by phone or fax, a Regal employee then enters the request into REA just as the healthcare provider would have done if the provider had submitted the authorization request through REA directly.  (SUF 20.)

### 2.    Regal Reviews The Medical Authorization Request.

A small percentage of medical authorization requests may be approved instantaneously in REA.  (SUF 13, 21.)  This occurs when the provider submits a routine request that meets certain criteria established by Regal.  (SUF 21.)  In most cases, however, the request must be reviewed by Regal's Medical Management Team. (SUF 22.)  Once received, the request must be reviewed and revised (or "packaged") by a coordinator in order to then be analyzed and decisioned by either a coordinator, nurse or doctor within Regal's Medical Management Team.  (SUF 22.)  Specifically, through the following steps, coordinators finalize the packaging of a medical authorization request:

DOLL AMIR & ELEY LLP

> (1) log into REA and view a queue of pending medical authorization requests categorized by the type of specific Regal employee required to review the set of requests;
>
> (2) select his or her queue to work, at which point the coordinator is presented with a screen reflecting the first authorization request to be worked;
>
> (3) review the request to determine what work, if any, needs to be done in order to package and decision the request; and
>
> (4) perform tasks required to finalize the packaging of the request, including sending any correspondence to the requesting provider to obtain further information about the patient, the diagnosis or the requested medical service.

(SUF 23-26.)

For example, coordinators are required to update data fields if the request included an improper location.  Coordinators also document any relevant history that pertains to the authorization request but was not already included in the request.  Coordinators also contact the requesting provider if the diagnosis and procedure codes do not match.  (SUF 27.)

After the packaging of a request is finalized (or the coordinator made the requisite attempts to obtain the necessary information to finalize the packaging), either the coordinator will approve the request or it will be escalated to a nurse or doctor within the Medical Management Team to be approved or denied.  (SUF 32.)

**3.   Regal Responds To The Medical Authorization Request.**

Regal responds to medical authorization requests by either requesting additional information, or approving or denying the request.  (SUF 28, 34.)  When a coordinator determines additional information is required to decision an authorization request, the coordinator generates a response letter through REA.  (SUF 28.)  Coordinators begin with a template letter.  (SUF 29.)  Coordinators then make

required modifications by revising or adding any required text.  (SUF 29.)  When the coordinator has reviewed and confirmed the information to be included in the response letter, the coordinator selects "create" in order to send the correspondence to the requesting healthcare provider.  (SUF 30.)  Once the coordinator selects "create" and generates the letter in REA, for providers who are set up to receive correspondence by fax, the letter is faxed or mailed to the requesting healthcare provider through the use of two additional softwares – adTempus and XMedius.  (SUF 31.)

Depending on the ultimate level of review, the coordinator, nurse or doctor will, in REA, indicate whether a request is approved or denied.  Then, either immediately after indicating the status or, if a denial letter, after reviewing and modifying the denial information to meet certain criteria, the coordinator, nurse or doctor will select "submit," causing REA to: (1) generate a letter; (2) make the letter available for review by the provider within REA; and, for providers who are set up to receive fax responses, (3) fax or mail the letter to the requesting healthcare provider through the use of adTempus and XMedius.  (SUF 33.)  In the end, every medical authorization request is met with a response and ultimately approved or denied.  (SUF 34, 45.)

**4.    Regal Uses adTempus and XMedius To Transmit Responses to Medical Authorization Requests Via Facsimile.**

Regal utilizes the adTempus program, which directs another program (XMedius) to fax out the letter.  (SUF 35.)  Specifically, adTempus grabs the letter from REA, along with the fax number to be used, and sends the letter and number to XMedius.  (SUF 36.)  XMedius uses the fax numbers it is provided by REA, through adTempus, in connection with each letter to be faxed.  (SUF 37.)  The fax numbers are the same numbers that have been keyed into and maintained in EZ-Cap, which are regularly uploaded from EZ-Cap to REA.  (SUF 37.)  Recognizing that fax attempts are not always successful, Regal attempts to re-send faxes to the intended recipients.

DOLL AMIR & ELEY LLP

(SUF 38.)  If the retries are unsuccessful, Regal prints the correspondence and sends it out via mail.  (SUF 39.)  In September 2013, Regal would attempt a maximum of sixteen (16) retries.  (SUF 40.)  Sometime thereafter, adTempus was modified such that it would permit a maximum of twelve (12) facsimile attempts for each correspondence.  (SUF 41.)

### C. Regal Inadvertently Transmitted Facsimiles To Plaintiff's Cell Number.

In April 2013, Dr. Cindy Huang submitted her contact information to Regal as part of her application to become one of Regal's contracted healthcare providers. (SUF 4.)  However, when a Regal employee inputted Dr. Huang's contact information into Regal's EZ-Cap database, she did so incorrectly; instead of inputting Dr. Huang's fax number (213-482-2182) into EZ-Cap, the Regal employee inputted Plaintiff's cellphone number (213-822-2182) ("Cell Number") into EZ-Cap as Dr. Huang's fax number.  (SUF 4.)

### 1. Regal Responded to Hundreds of Medical Authorization Requests from Dr. Huang.

Between September 10, 2013 and August 17, 2015, Dr. Huang submitted hundreds of medical authorization requests to Regal.  (SUF 5.)  Indeed, Dr. Huang submitted approximately 269 requests directly through REA and approximately 68 requests by phone or fax.  (SUF 42.)  In response, Regal prepared and sent Dr. Huang 500 different letters through the process described above.  (SUF 43.)

#### i. Regal Responded to Most of the Requests Only After Review by the Medical Management Team.

Regal attempted to send Dr. Huang 420 of those 500 letters only after review by the Medical Management Team.  (SUF 44.)  The medical authorization request received on October 17, 2013 is one example that illustrates the multiple levels of review that may be required.  Between October 17 and November 5, numerous Regal employees worked on the request by reviewing the medical service requested,

7

DOLL AMIR & ELEY LLP

1   determining that further information was needed, generating correspondence to Dr.
2   Huang to request that specific information and ultimately notifying Dr. Huang that the
3   request was denied.  (SUF 45-46.)  In total, Regal employees generated and attempted
4   to fax ten letters to Dr. Huang in response to the authorization request.  (SUF 47.)

5                           *ii.*      ***Regal Responded Instantaneously To Some Requests***
6                                      ***Submitted By Dr. Huang.***

7          As noted above, once Regal receives a medical authorization request, the
8   request may be approved, or otherwise provided a response, instantaneously in REA.
9   (SUF 21.)  Between September 10, 2013 and August 17, 2015, Regal attempted to
10  send 80 letters to Dr. Huang instantaneously following receipt of medical
11  authorization requests that met criteria to allow for such responses.  (SUF 22.)

12         **2.      Separate And Apart From The Medical Authorization**
13                   **Responses, Regal Employees Also Attempted to Fax A Limited**
14                   **Number Of Communications Directly To Dr. Huang.**

15         Between September 10, 2013 and August 17, 2015, Regal employees also
16  attempted to send twenty-six (26) records to Dr. Huang in her capacity as a contracted
17  healthcare provider outside the REA platform, but rather using XMedius directly.
18  (SUF 49-50.)  This happened in two ways.

19         First, the Information Technology ("IT") Department has the ability to send
20  group faxes directly through XMedius.  (SUF 51.)  Therefore, at the request of
21  another Regal employee, a member of Regal's IT Department sent seventeen (17)
22  faxes to Dr. Huang and a select group of healthcare providers contracted with Regal.
23  (SUF 52.)

24         Second, certain Regal employees are able to send faxes from their desktops
25  using XMedius directly.  (SUF 53.)  As a result, nine (9) individual Regal employees
26  attempted to send a direct fax to Dr. Huang.  (SUF 54.)  For example, on February 11,
27  2015, a Regal employee by the name of Narcisa Madrid, with a User ID of
28  nmadrid@regalmed.com, attempted to send Dr. Huang correspondence directly

8

through XMedius at the Cell Number notifying her that medical services for a lump detected in a breast had been approved and, in fact, Ms. Madrid received confirmation that it was sent successfully.  (SUF 55.)

### D.   The Numerous Successful Transmissions Prevented Regal From Identifying The Cell Number As Invalid.

Regal had a process in place to detect invalid fax numbers.  (SUF 56.) However, Regal did not identify the Cell Number as an invalid number until August 2015.  (SUF 56.)  Regal's detection process was based on identifying fax attempt failures.  (SUF 57.)  As reflected in the REA Log, XMedius communicated to REA, through adTempus, that numerous fax attempts made to the Cell Number were successfully delivered (meaning that the remote end confirmed that it received the last page of the correspondence).  (SUF 58.)

### E.   Plaintiff Made Only A Single Attempt To Notify Regal.

Plaintiff concedes he made only one attempt to notify Regal that it was attempting to send faxes to the Cell Number.  (SUF 61.)  Between September 10, 2013 and May 30, 2014, Regal made over 500 attempts to send a fax to the Cell Number.  (SUF 60.)  Plaintiff contends he called Regal on May 30, 2014.  (SUF 61.) Plaintiff does not recall with whom he spoke.  (SUF 61.)  Plaintiff does not recall what he said.  (SUF 61.)  Plaintiff does not recall what was said to him.  (SUF 61.) Plaintiff admits he never again attempted to contact Regal.  (SUF 61-62.)  He never wrote.  (SUF 62.)  He never emailed.  (SUF 62.)  He never called after May 30, 2014. (SUF 61.)

Plaintiff avoided any disruption caused by the fax attempts.  Plaintiff concedes that he did not answer all the calls.  (SUF 63.)  Indeed, Plaintiff concedes he does not know how many calls he answered.  (SUF 63.)  Moreover, Plaintiff admits he blocked Regal's number so that it would not ring and that he often turned his phone off.  (SUF 64.)  Plaintiff also testified that Regal did not call late at night.  (SUF 65.)

Thereafter, in August of 2015, Plaintiff filed suit against Regal, bringing only a

9

DOLL AMIR & ELEY LLP

single cause of action for violation of the TCPA.  Based on Regal's fax attempts,

Plaintiff claims entitlement to approximately $9 million in statutory penalties.

III.   **LEGAL STANDARD**

Summary judgment shall be granted where the pleadings and supporting

materials demonstrate "there is no genuine issue as to any material fact and . . . the

movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).  Where the moving party does not bear the burden of proof at trial,

the moving party may produce evidence negating an essential element of the

nonmoving party's case, or may simply show that the nonmoving party does not have

enough evidence of an essential element of its claim to carry its burden at trial. *See*

*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

Once the moving party meets the initial burden, the burden then shifts to the plaintiff

to show that a triable issue of fact exists. *See id*.

IV.   **ARGUMENT**

A.   **The Telephone Consumer Protection Act**

The Telephone Consumer Protection Act ("TCPA") was originally enacted to

"protect the privacy interests of residential telephone subscribers by placing

restrictions on unsolicited, automated telephone calls to the home and to facilitate

interstate commerce by restricting certain uses of facsimile machines and automatic

dialers." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009).

Stated another way, "Congress enacted the TCPA to deal with the increasing use of

automated systems to place large volumes of calls" to the public. *Legg v. Voice*

*Media Group, Inc.*, 20 F.Supp.3d 1370, 1374 (S.D. Fla. 2014).

At the time the statute was enacted, telemarketers typically used autodialing

equipment that placed a high volume of calls by randomly or sequentially generating

the numbers to be dialed. *See Dominguez v. Yahoo, Inc.*, 2015 WL 6405811, at *2

(3d Cir. 2015).  As a result, the TCPA prohibited, among other things, calls made to

cellular devices using an "automatic telephone dialing system" or ATDS, which is

Doll Amir & Eley LLP

statutorily defined as equipment that has the "capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1).  *See Dominguez*, 2015 WL 6405811, at \*2*; § 227(b)(1)(A)(iii).  The TCPA further prohibited unsolicited advertisements sent by facsimile.  *Id.* § 227(b)(1)(C).  Finally, Congress gave the Federal Communications Commission ("FCC") authority to prescribe regulations to implement the TCPA's requirements.  *Id.* § 227(b)(2).

### 1.     An ATDS Requires The Ability To Dial Numbers Without The Need Of Human Intervention.

As time progressed, the technology used by telemarketers evolved, and much of that technology did not squarely fit in the statutory definition of an ATDS.  *See Legg*, 20 F.Supp.3d at 1374.  Particularly, predictive dialers—systems that attempt to "predict" when telemarketers will be free, and when consumers will pick up, and automatically dial consumer numbers accordingly (and *en masse*) to minimize downtime for the telemarketer—became prevalent, and these systems relied upon lists of telephone numbers, instead of randomly generating numbers as required by the ATDS statute.  Thus, in order to effectuate the purpose of the TCPA, again, "to deal with the increasing use of ***automated*** systems to place ***large volumes*** of calls", the FCC ruled "that the defining characteristic of an ATDS is 'the capacity to dial numbers without human intervention.'"  *Id.* at 1374 (emphasis added).

As a result, in determining whether an ATDS is used in violation of the TCPA, courts look to whether a system lacks "human intervention."  *See id.*  *See also Estrella v. Ltd. Fin. Servs., LP*, 2015 WL 6742062, at \*1 (M.D. Fla. 2015) ("The essential function of an ATDS is 'the capacity to dial numbers without human intervention.'"); *Nunes v. Twitter, Inc.*, 2014 WL 6708465, at \*1 (N.D. Cal. 2014) ("[an ADTS] appears to encompass any equipment that stores telephone numbers in a database and dials them without human intervention.").  Where the human interaction is minimal, such as the mere uploading of a list of phone numbers to dial—leaving it

DOLL AMIR & ELEY LLP

to the system to indiscriminately dial each of these numbers *en mass*—courts have held that a system requiring such minimal human interaction is within the scope of the TCPA. *See, e.g.*, *Sterk v. Path, Inc.*, 46 F.Supp.3d 813, 819 (N.D. Ill. 2014). On the other hand, where human action is significantly involved in the dialing of the numbers or the transmissions of messages—such as the composition of specific messages directed at specific individuals—courts have found that such human intervention takes the system outside the scope of the TCPA as matter of law, even if some automation of the process is involved. *See, e.g. Derby v. AOL, Inc.*, 2015 WL 3477658, at *4 (N.D. Cal. 2015). *See also Gaza v. LTD Fin. Servs., L.P.*, 2015 WL 5009741, at *4 (M.D. Fla. 2015) ("[Plaintiff's] claims fail as a matter of law because he failed to establish a genuine issue for trial with respect to whether the calls were placed using an ATDS, a necessary element of his claims.").

For example, where a human individually places each call or message (or individually causes a system to place each call or message), the system is not an ATDS as required by statute. *Estrella*, 2015 WL 6742062, at *3 ("To the contrary, the evidence demonstrates, at most, that the calls were placed manually with the use of human intervention through a 'point and click function.'"); *Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1193-1194 (W.D. Wash. 2014) (finding that to dial and transmit dispatch notification to a taxi, "the dispatcher must have pressed 'enter' to transmit ... information to both the TaxiMagic program and the nearest available driver.").

Similarly, where a human individually drafts and sends each message, no ATDS can be found. *See Luna v. Shac, LLC*, 122 F.Supp.3d 936, 940 (N.D. Cal. 2015) ("Here, human intervention was involved in several stages of the process prior to Plaintiff's receipt of the text message, including transferring of the telephone number into the CallFire database, drafting the message, determining the timing of the message, and clicking 'send' on the website to transmit the message to Plaintiff."); *Jenkins v. mGage, LLC*, 2016 WL 4263937, at *5 (N.D. Ga. 2016). *See also Derby*,

Doll Amir & Eley LLP

2015 WL 3477658, at *4 (analogizing to *Johnson v. Yahoo!, Inc.*, 2014 WL 7005102, at *5 (N.D. Ill. 2014), which held that "[w]hen a user sends a personalized message to a contact, it is clear that that transmission involves human intervention").

These principles hold true even if automation is used to assist the process. For example, in *Flores v. Adir International, LLC*, 2015 WL 4340020 (C.D. Cal. 2015), the defendant sent numerous text messages to the plaintiff in an attempt to collect a debt. *Id.* at *1. In bringing a claim under the TCPA, the plaintiff argued that the messages appear scripted and automated, and thus alleged that defendant was using an ATDS. *Id.* at *4. However, the court rejected the argument, holding that the mere use of automation alone is insufficient:

> It may be that the use of a generic template and immediate responses permit the reasonable inference that Defendant's equipment is capable of some form of automation. However, 'automation' alone is not enough to satisfy the definition of an ATDS under the TCPA.

*Id.* Instead, the court observed that defendant knew who plaintiff was, and sent these messages directly to the plaintiff to collect a specific debt from the plaintiff. *Id.* This direct targeting was indicative of human intervention and curation, and thus, outside the scope of the TCPA. *See id.* at *5 ("Plaintiff's allegations suggest Defendant's text messages were anything but random or 'impersonal.' Plaintiff alleges that Defendant contacted him for the purpose of collecting on a specific debt. Moreover, each of the text messages included the same reference number, even if they did not identify Plaintiff by his name. This level of direct targeting suggests some sort of 'human curation or intervention' rather than the 'random or sequential number generator' required for an ATDS."). *See also Jenkins*, 2016 WL 4263937, at *5 (where human required to draft and send each message, no ATDS found, even if message can be sent to multiple people, and scheduled to send at different times).

As a result, where calls or messages are sent for a specific purpose to specific people, and the transmission of each message involves some human control, courts

DOLL AMIR & ELEY LLP

DOLL AMIR & ELEY LLP

have consistently held that such systems are deemed outside the scope of the TCPA as a matter of law.  This is true even if that message is broadcasted to a group of people.  *See id.* (promotional messages sent to a list of numbers were not sent by an ATDS, where messages were individually drafted by humans).  *See also McKenna v. WhisperText*, 2015 WL 428728 (N.D. Cal. 2015) (group SMS invitations sent by an app not an ATDS where messages were sent "only at the user's affirmative direction to recipients selected by the user"); *Glauser v. GroupMe, Inc.*, 2015 WL 475111, at *6 (N.D. Cal. 2015) (Welcome texts sent to new users of app were "triggered by the group creator's addition of plaintiff to the group").  This also holds true even if the same telephone number is ***repeatedly*** dialed, where human intervention is required to initiate a new call to a different number.  *See Wattie-Bey v. Modern Recovery Solutions*, 2016 WL 1253489, at *4 (M.D. Pa. 2016) ("the 'repeat dial' feature described in this excerpt simply redials a single phone number repeatedly, with human intervention necessary to dial any other numbers.").

**B.**     **Regal's Conduct Falls Outside The Scope Of The TCPA.**

**1.**     **Regal Did Not Send Unsolicited Advertisements By Facsimile To Plaintiff.**

As an initial matter, Plaintiff's claim under the TCPA must fail as a matter of law because the only section in the TCPA regulating facsimile transmissions pertains to unsolicited ***advertisements*** by facsimile.  47 U.S.C. § 227(b)(1)(C) (prohibiting the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement").  It is undisputed that Regal inadvertently made numerous fax attempts to Plaintiff's cell phone number from September 2013 to August 2015.  (SUF 5.)  The fax attempts were intended to be sent to Regal's contracted medical provider, Dr. Cindy Huang.  (SUF 6.)  It is undisputed the fax attempts only consisted of letters sent in response to medical authorization requests received by Dr. Huang and letters sent to Dr. Huang in her capacity as a healthcare provider contracted with Regal.  (SUF 7.)  Plaintiff concedes

14

the only communications at issue were fax attempts.  (SUF 9.)  There is no evidence whatsoever that the fax attempts included advertisements as defined by the TCPA. (SUF 7-8.); 47 U.S.C. § 227(b)(1)(C) ("any material advertising the commercial availability or quality of any property, goods, or services").  As a result, the TCPA is simply inapplicable.

In an attempt to stretch the TCPA to encompass the conduct at issue, it is anticipated that Plaintiff will argue that the TCPA restrictions pertaining to "calls" to cellular phones under 47 U.S.C. § 227(b)(1)(A)(iii) apply equally to facsimiles to cellular phones as well.  However, if Congress intended to include facsimiles in that section pertaining to calls, it would have done so.  The law is clear that where, as here, Congress included express language concerning facsimiles in 47 U.S.C. § 227(b)(1)(C), but not in 47 U.S.C. § 227(b)(1)(A)(iii), a court cannot read omitted language into the provision.  *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) ("It is generally presumed that [the Legislature] acts intentionally and purposely when it includes particular language in one section of a statute but omits in another."); W*est Coast Truck Lines, Inc. v. Arcata Community Recycling Center, Inc*., 846 F.2d 1239, 1244 (9th Cir. 1988) ("When some statutory provisions expressly mention a requirement, the omission of that requirement from other statutory provisions implies that [the Legislature] intended both the inclusion of the requirement and the exclusion of the requirement.").

And although Plaintiff may point to case law expanding the definition of "calls" under the TCPA to include text messages, in an attempt to argue that the definition should further be expanded to include facsimiles, those authorities are inapposite.  Specifically, those authorities are based on the reasoning that the TCPA was enacted in 1991 when text messaging was not available and, therefore, could not be expressly included.  *Satterfield*, 569 F.3d at 954 ("this law was enacted in 1991 when text messaging was not available"); *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1008 (N.D. Ill. 2010) ("recognized that statutes must be

15

permitted to apply to technologies not in existence when a statute was drafted"). Thus, it made sense to include text messages in the definition of "calls", as it would further the purpose of the TCPA.

However, not only did facsimiles exist in 1991 (and thus could have expressly been included in the definition of "calls"), the TCPA expressly regulated facsimile transmissions in an ***entirely separate*** provision. *See* 47 U.S.C. § 227(b)(1)(C). In fact, even the FCC recognized that the TCPA's regulations of calls and faxes are separate, and laws applicable to one are not necessarily applicable to the other. See *Palm Beach Golf Center-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1254 (11th Cir. 2015) ("the FCC submitted a letter in which it observed that 'the *DISH Network* ruling applie[d] only to liability for telemarketing calls and neither addresse[d] nor alter[ed] the Commission's pre-existing regulatory treatment of unsolicited facsimile advertisements.'"). As observed by the Eleventh Circuit, "because the language used by Congress differs with respect to liability under the telephone call and fax provisions of the statute, the FCC's interpretation with respect to one need not apply to the other." *Id.* 1255. Thus, Plaintiff's attempt to include facsimile transmissions within the meaning of "call" in 47 U.S.C. § 227(b)(1)(A)(iii) is without merit.

As a result, the only section actually regulating facsimile transmissions under the TCPA pertain to ***advertisements*** by facsimile, and because it is undisputed that Regal did not send advertisements to Plaintiff via facsimile, Plaintiff's claim under the TCPA must fail as a matter of law.

**2.     Regal's Process For Sending Facsimiles Is Not An ATDS Because Significant Human Intervention Was Required To Generate The Correspondence And Attempt To Send It To The Intended Medical Provider.**

Further, even if the restrictions in 47 U.S.C. § 227(b)(1)(A)(iii) applied to facsimile transmissions, the undisputed material facts demonstrate that Regal's

16

DOLL AMIR & ELEY LLP

medical authorization procedures require significant human intervention, taking it outside the scope of the TCPA. (SUF 10-65.) The transmissions to Plaintiff's cellular phone can be placed into three general categories: (1) medical authorization responses that required in-depth review, (2) medical authorization responses that were routine, and (3) direct attempts by Regal employees to communicate with Dr. Huang. Each of these categories of transmissions require significant human interaction before any transmission can be sent.

### a. Response Faxes to Medical Authorization Requests Made By Dr. Huang

The human interaction, curation, and intervention is undeniably pronounced with respect to medical authorizations. ***First***, it is undisputed that before any medical authorization response can be sent from Regal, a medical authorization ***request*** must be made by a medical provider to Regal—Regal cannot unilaterally approve a request that was never asked for. (SUF 15.) Further, there is no question that each medical authorization request requires significant human curation and intervention. (SUF 16-20.) A specific patient must be diagnosed, a specific medical service must be recommended, and the reasons justifying this procedure must be presented by the medical provider. (SUF 16.) Finally, the medical provider must manually transmit the request to Regal, either by entering the relevant information into Access Express, or directly submitting the information to Regal through either fax or telephone (upon which Regal employees will manually enter the request into Access Express). (SUF 17-20.) Given the significant medical judgment and manual steps required to make these authorization requests, these steps simply cannot be made automatically without human intervention, much less made *en mass* to an unsuspecting public.

***Second***, once a medical authorization request is submitted, it is undisputed that a determination must be made with respect to that ***specific*** request. (SUF 21-34.) Upon receiving a medical authorization request, Regal generally responds in one of two ways, depending on if the request requires an in-depth review, or if the request

17

DOLL AMIR & ELEY LLP

1  allows for a routine response.  (SUF 21-22.)  Both of these responses require

2  significant human intervention, disqualifying the existence of an ATDS.

3                **(i)**        **Requests That Require In-Depth Analysis**

4       In the vast majority of cases (here, 420 out of the 500 response letters at issue),

5  the medical authorization must be analyzed in-depth by Regal's Medical Management

6  Team before determining an appropriate response.  (SUF 44.)  A Regal coordinator

7  will first attempt to analyze the request, review for (and address) any errors, and

8  determine (based on facts presented in the request and the service requested) if the

9  coordinator has the authority to decision the request him or herself.  (SUF 22-32.)  If

10  more medical expertise is required, the request will be escalated to a nurse or

11  physician, who will then review and decision the request, based on his or her medical

12  judgment.  (SUF 32.)  Only after this significant human analysis is performed will a

13  response be provided—a response that must be *specific to the request*.  That is,

14  depending on the request made, and the facts surrounding the patient and medical

15  service at issue, the request will either be approved, denied, or further information

16  will be requested.  (SUF 32-34.)  Given the personalized nature of medical services,

17  responses cannot be generic—they must be specific to the medical authorization

18  request made.  Since these responses by Regal not only require significant human

19  intervention to initiate a request, but also require further human analysis, a

20  personalized response composed by a human and an individual to press "create" or

21  "submit" (SUF 31, 33), Regal's process does not qualify as an ATDS.  *See, e.g.*,

22  *Derby*, 2015 WL 3477658, at *4 (analogizing to *Johnson v. Yahoo!, Inc.*, 2014 WL

23  7005102, at *5 (N.D. Ill. 2014), which held that "[w]hen a user sends a personalized

24  message to a contact, it is clear that that transmission involves human intervention").

25  *See also Luna*, 122 F.Supp.3d at 941 ("human intervention was involved in drafting

26  the message, determining the timing of the message, and clicking 'send' on the

27  website to transmit the message to Plaintiff").

28       For example, in *Jenkins*, 2016 WL 4263937, the court observed that given the

DOLL AMIR & ELEY LLP

significant human intervention involved where users personally composed messages, determined the timing of the messages, and clicked send to begin transmission of the message, such systems could not constitute as an ATDS:

> [T]o send promotional messages, an Opera employee had to: (i) navigate to a website; (ii) log into the Platform; (iii) determine the content of the text message; (iv) type the content of the text message into the Platform; (iv) determine whether to send the text message immediately or to schedule a later date to send the message; (v) either click "send" to send the message immediately, or take action to select a later date and time to send the message by using a drop-down calendar function.

*Id.* at *5.

Similarly here, in order to send responses to requests requiring in-depth review, a Regal employee had to: (1) navigate to Regal's website; (2) log into the platform; (3) analyze and address any errors in the request; (4) determine if the coordinator has authority to respond to the request, or otherwise escalate it to a medical practitioner; (5) compose the appropriate response to either approve or deny the procedure or service requested for the particular patient request, or request additional information; (6) click send to begin transmission of the response to the medical practitioner.  (SUF 21-31.)  Plainly, the facts of this case not only parallel the level of human interaction in *Jenkins*, but further exceed it.

Given these undisputed facts, there can be no doubt that a tremendous amount of human intervention is required before any medical authorization response may be sent by Regal, and therefore, Plaintiff cannot prove that Regal used an ATDS as a matter of law.

### (ii)   Requests Allowing For A Routine Response

A small minority of the transmissions sent to the Cell Number were requests that allowed for routine responses.  That is, if a request meets certain criteria (criteria that must be manually specified and configured by Regal), Regal will respond automatically to that request through REA.  (SUF 21, 48.)  Here, only 80 of the 500

DOLL AMIR & ELEY LLP

1  response letters were generated instantaneously in response to Dr. Huang's submitted
2  requests.  (SUF 48.)

3    Considering that these automatic responses are ***only*** sent when specifically
4  requested by a human user—that is, the user/medical provider must provide very
5  specific information, seek a specific request, and must meet very limited criteria in
6  order for the request to receive a routine response—human intervention is plainly
7  required before the message can be sent.  *See, e.g., Gragg*, 995 F.Supp.2d at 1194
8  ("The system is able to dial and transmit the dispatch notification only after the driver
9  has physically pressed 'accept': human intervention is essential").

10    For example, in *McKenna*, 2015 WL 428728, the plaintiff received a text
11  message invitation to join an application (called WhisperText) sent to his cellular
12  phone.  *Id.* at *1.  Because the message was sent automatically to his phone upon the
13  request of another user, the plaintiff alleged violation of the TCPA.  *Id.* at * 2
14  (claiming "text calls were made *en masse* to all class members through the use of an
15  automated system whereby the messages were sent without human intervention").
16  Despite the use of automated responses, the court in *McKenna* found the plaintiff's
17  TCPA claim failed as a matter of law, given the human interaction required to initiate
18  this specific response: "Whisper App can send SMS invitations ***only at the user's***
19  ***affirmative direction*** to recipients selected by the user…. [U]nder such
20  circumstances, the action taken is with human intervention—disqualifying the
21  equipment at issue as any kinds of ATDS."  *Id.* at * 3(emphasis added);

22    Similarly here, routine responses to the requests can only occur at the medical
23  provider's affirmative direction.  (SUF 15-21.)  Indeed, the human interaction is even
24  more significant than *McKenna*.  Whereas the user in *McKenna* need only select a
25  recipient to send the automated message to, a medical provider in this case must
26  select a specific patient, select a specific qualifying procedure or service, and meet
27  very limited criteria (criteria manually selected and configured by Regal) in order to
28  receive a routine response.  (SUF 15-21, 48.)  If the criteria are not met (as is often

DOLL AMIR & ELEY LLP

20

the case), the request must undergo in-depth review by Regal explained above, *requiring even further* human intervention.  As a result, the level of human intervention set forth in *McKenna* is clearly met (and exceeded) here, once again disqualifying the use of an ATDS.

### b.    Direct Faxes Intended For Dr. Huang

Finally, there were a small amount of fax attempts (constituting 26 of the letters at issue) that were made by a Regal employee seeking to communicate directly with Dr. Huang.  (SUF 49-55.)  Namely, in an attempt to contact Dr. Huang, the employee would use the XMedius software directly on his or her desktop by, for example: (1) opening a Microsoft Word document; (2) selecting "Print" and selecting the printer identified as "XMediusFax;" (3) manually entering the fax recipients' contact information into the fields provided (based on a review by the Regal employee of the recipient's contact information in EZ-CAP or REA) or importing the contact information from Microsoft Outlook (if the Regal employee had saved the recipient's contact information in his or her Microsoft Oulook contacts); and (4) selecting "OK" to allow XMedius to fax the composed message to the recipient.  (SUF 50.)  Thus, like other forms of electronic direct messaging, this too falls outside the scope of an ATDS (and the TCPA).  Again, "'[w]hen a user sends a personalized message to a contact, it is clear that that transmission involves human intervention.'"  *Derby*, 2015 WL 3477658, at *4 (quoting *Johnson*, 2014 WL 7005102, at *5).  In *Derby*, the court found no ATDS where "an AIM user 'inputted a mobile phone number' and directed the system to send plaintiff a text message, the contents of which were composed by the AIM user.  *Id.* at *3.  Thus here, this Court should find no ATDS where an XMedius user simply inputs the recipient, directs XMedius to send an electronic message, the contents of which were composed by the XMedius user.

In summary, as set forth above in Sections IV(B)(2)(a)-(b), it is clear that any message sent by Regal required significant human intervention, disqualifying the use of an ATDS in this case.  Each medical authorization decision transmitted by Regal

DOLL AMIR & ELEY LLP

was in direct response to a request made by a medical practitioner pertaining to a specific patient and a specific procedure.  Each such decision was personalized specifically to each request, and required multiple levels of human analyses.  To be sure, not only was human judgment required to respond to these requests, but in some cases, professional medical judgment was required as well.

Therefore, the human intervention in this case is undeniable, and because Plaintiff cannot establish that the messages sent to him were sent through an ATDS, Plaintiff's claim under the TCPA must fail as a matter of law on this basis as well.  In the alternative, partial summary judgment of Plaintiff's claim should be granted as to one or more of the response categories identified in Sections IV(B)(2)(a)-(b).

### 3.   Mere Repeat Dialing Is Insufficient To Bring A System Under The TCPA

It is anticipated that Plaintiff will argue that no human intervention was necessary when Regal automatically redialed Plaintiff's cellular phone after the initial fax transmission failed, and thus, claiming that the system dials numbers without human intervention.  However, as noted above, merely redialing the same number repeatedly is insufficient to create an ATDS, as the system still requires human input to initiate a *new* call or message to a *new* recipient.  *See Wattie-Bey*, 2016 WL 1253489, at *4.  Indeed, the exact timing of the message is not significant, as long as human intervention was required to start the process.  *See Jenkins*, 2016 WL 4263937, at *5 (no ATDS where "click[ing] 'send' [could] send the message immediately, or take action to select a later date and time").  And this distinction makes perfect sense—again, the TCPA was enacted to deal with the use of automated systems to place a large volume of calls, dialing number after number in an attempt to maximize a telemarketer's potential targets.  This concern is not raised where a single number is repeatedly dialed (particularly when the redial only occurs when the initial dial fails), as human oversight and interaction is still required to dial additional numbers, creating a barrier to dialing indiscriminately and *en mass*.

Doll Amir & Eley LLP

22

DEFENDANT REGAL MEDICAL GROUP, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1  The simple fact is, Regal's system is not the type of system that the TCPA was

2  designed or intended to encompass, and common sense dictates that the TCPA—and

3  the draconian penalties that come with it—should not apply here.  As explained by

4  one court:

5      The Ninth Circuit recently emphasized that courts must look to the
       surrounding circumstances in determining whether particular calls "run
6      afoul of the TCPA," and in so doing, courts must "approach the problem
       with a measure of common sense."  The application of common sense
7      requires looking to the purposes of the TCPA, which the Ninth Circuit
       has defined as protecting consumers from the "nuisance" and "invasion
8      of privacy" that result from "unsolicited, automated" telemarketing
       calls."
9

10

11  *Derby*, 2015 WL 3477658, at *6 (internal citations omitted).

12  Here, Regal's system is not designed to flood the general public with intrusive,

13  nuisance, telemarketing calls.  Unlike predictive dialers, or other mass marketing

14  systems for which TCPA liability is typically found, Regal's system is not designed to

15  place call after call to unsuspecting consumers.  Instead, Regal's system is intended to

16  operate as a ***closed system***, where information is exchanged privately between Regal

17  and its medical providers regarding specific patients and specific procedures.  At no

18  time did Regal intend (or desire) to have any communication sent to the general

19  consuming public, much less Plaintiff.  Thus, although it may be regrettable that

20  Plaintiff was the unintended recipient of failed fax transmissions sent to his cellular

21  phone, there is no legal basis to stretch a telemarketing statute to apply to this case

22  and grant Plaintiff a multi-million dollar windfall through the TCPA's draconian

23  penalties.  Regal's conduct was not intended to be encompassed by the TCPA, and

24  common sense dictates that Plaintiff's claims in this regard must be rejected.

25  **V.    CONCLUSION**

26  For the foregoing reasons, Regal's Motion for Summary Judgment must be

27  granted.  The only restriction on facsimile transmissions under the TCPA pertains to

28  advertisements sent via facsimile, and because it is undisputed that Regal did not send

Doll Amir & Eley LLP

1  Plaintiff any facsimile advertisements, the TCPA is inapplicable as a matter of law.

2  Further, considering the significant human intervention required to submit a medical

3  authorization request, process that request, and return a response, Regal's system does

4  not constitute an ATDS under the TPCA, and therefore Plaintiff's claims under the

5  TCPA must fail as a matter of law on this basis as well.

6

7      DATED:  October 12, 2016                    **DOLL AMIR & ELEY LLP**

8                                                    By:    _/s/ Hunter R. Eley_          .
9                                                          HUNTER R. ELEY
                                                          CHELSEA L. DIAZ
10                                                        Attorneys for Defendant,
                                                          REGAL MEDICAL GROUP, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOLL AMIR & ELEY LLP

DEFENDANT REGAL MEDICAL GROUP, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY
JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT