**O**

# United States District Court
# Central District of California

ASHAMAD PINCHEM,

               Plaintiff,

     v.

REGAL MEDICAL GROUP, INC.,

               Defendant.

Case № 2:15-cv-06518-ODW (KLSx)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [25]**

## I.   INTRODUCTION

This is an action under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). Defendant Regal Medical Group, Inc., an organization that receives and responds to medical care requests for participants in HMO insurance plans, inadvertently entered Plaintiff Ashamad Pinchem's cellphone number as the fax number of Dr. Cindy Huang in its database. Over the next 23 months, Regal attempted to send over 5,800 "faxes" Plaintiff's cellphone number, most of which were responses to medical care requests submitted by Dr. Huang. Unsurprisingly, Plaintiff sued. Regal now moves for summary judgment, arguing that fax transmissions are not "calls" under the TCPA, and that in any event its calling system is not an "automatic telephone dialing system" ("ATDS") under the TCPA. For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART**

1   Regal's Motion for Summary Judgment.  (ECF No. 25.)[1]

2   ## II.   BACKGROUND

3       Regal is an independent practice association which arranges and pays for
4   medical care to members of HMO insurance plans.  (Statement of Undisputed Facts
5   ("SUF") 1, ECF No. 44-3.)  To this end, Regal contracts with thousands of physicians,
6   including Dr. Cindy Huang.  (SUF 2, 6.)  One of Regal's primary functions is to
7   authorize or deny medical service requests from its contracted healthcare providers.
8   (SUF 3.)  A provider may submit a request through a portal called Access Express.[2]
9   (SUF 18.)  Some requests are automatically approved by Access Express (i.e., without
10  any human review) if the request meets certain criteria.  (SUF 21.)  Most requests,
11  however, must be reviewed by a coordinator, a nurse, or a doctor.  (SUF 22.)  That is,
12  a coordinator will login to Access Express to view the request, will "finalize" the
13  request (e.g., by obtaining any missing or inaccurate information from the provider,
14  correcting typos in the request, etc.), and will either approve the request or escalate it
15  to a nurse or doctor for approval or denial.  (SUF 23–27, 32, 34.)  Once a final
16  decision on the request is made, it is manually submitted (i.e., by a human) to Access
17  Express, which then automatically generates a response letter to the healthcare
18  provider.  (SUF 33.)

19      Regal uses four programs in order to fax out the letter: EZ-Cap, Access
20  Express, XMedius, and adTempus.  (SUF 92.)  EZ-Cap is a database that stores the
21  fax numbers of Regal's contracted providers.  (SUF 95.)  Access Express generates
22  the response letter to the healthcare provider once a decision to deny or approve the
23  request is made.  (SUF 101, 102.)  Access Express controls the method of delivery
24  (i.e., fax or mail); the sender has no control over the method of delivery.  (SUF 103.)

25

---

26     [1] After considering the papers filed in connection with the Motion, the Court deemed the matter
27  appropriate for decision without oral argument.  Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.
   [2] The provider may also submit a request by telephone or fax, in which case a Regal employee
28  will manually enter the request into the portal for processing.  (SUF 19, 20.)

When Access Express determines that the letter will be sent by fax, another computer program pulls the appropriate fax number from EZ-Cap into Access Express on a preset schedule.  (SUF 97.)  Both the letter and the fax number are then placed in a queue.  (SUF 104.)  At the front of the queue, adTempus transfers both the letter and the fax number to XMedius.  (SUF 105, 106.)  XMedius places the fax into another queue based on a preset priority.  (SUF 107.)[3]  When the fax reaches the front of this queue, XMedius dials the corresponding number.  (SUF 108.)  If the fax attempt is unsuccessful, XMedius will put the fax back into the queue and will attempt to resend it up to three times (for a total of four attempts).  (*Id.*)  After four failed attempts, XMedius automatically informs adTempus that the fax has failed.  (*Id.*)  adTempus then instructs XMedius to reattempt to send the fax.  (SUF 109.)  This cycle repeats four times, resulting in sixteen total attempts per fax.[4]  (SUF 109, 110.)  After sixteen unsuccessful attempts, adTempus sends the letter back to Access Express, which then sends the letter out by mail instead.  (SUF 111.)

At some point, Regal inadvertently entered Plaintiff's cellphone number as Dr. Huang's fax number in the EZ-Cap database.  (SUF 4.)  Thus, between September 2013 and August 2015, Regal attempted to fax 500 authorization letters to Plaintiff's cellphone.  (SUF 5, 7, 43.)  80 of these letters were "automatic approval" letters that did not go through any human review; the remaining 420 letters were reviewed by a coordinator, nurse, or doctor.  (SUF 44, 48.)  In addition, Regal attempted to fax 26 other letters to Plaintiff's cellphone: 17 were part of a group fax sent by Regal's Information Technology Department at the request of a Regal employee, and 9 were direct fax attempts by a Regal employee.  (SUF 7, 51–54.)  The IT Department could send group faxes directly through XMedius.  (SUF 51.)  The Regal employees could

---

[3] Regal employees have no control over where a given fax goes in the queue.  (SUF 107.)

[4] Regal asserts that sometime between September 2013 and August 2015, adTempus was modified such that it would permit a maximum of only twelve attempts per fax.  (SUF 41.)  Plaintiff disputes this, and contends that the fax logs demonstrate that XMedius attempted to send each fax to him sixteen times all the way through August 2015.  The Court finds this difference immaterial.

also send faxes directly through XMedius by manually entering in the recipient's fax number and clicking "send." (SUF 50, 53.) Plaintiff contends that in total, Regal made 5,810 fax attempts to his cellphone. (SUF 74.)

### III.   LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). A disputed fact is "material" where the resolution of that fact might affect the outcome of the suit under the governing law, and the dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). Conclusory or speculative testimony in affidavits is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill's Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Moreover, though the court may not weigh conflicting evidence or make credibility determinations, there must be more than a mere scintilla of contradictory evidence to survive summary judgment. *Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). Where the moving and nonmoving parties' versions of events differ, courts are required to view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott*, 550 U.S. at 378.

### IV.   DISCUSSION

Regal argues that fax transmissions are not "calls" under the TCPA, and that its calling system is not an "automatic telephone dialing system." The Court concludes that Regal's system was not functioning as an ATDS when employees used it to send out the nine faxes directly to Plaintiff. However, the Court otherwise disagrees with Regal's arguments.

**A.   Whether Attempted Faxes are "Calls"**

Regal argues that attempted faxes are not "calls" within the meaning of 47

U.S.C. § 227(b)(1)(A).[5]  (Mot. at 14–16.)  The Court disagrees.

The TCPA provision regulating calls to cellphones provides as follows:

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States--

(A) to make *any call* (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice--

. . .

(iii) to any telephone number assigned to a . . . cellular telephone service . . . .

47 U.S.C. § 227(b)(1)(A)(iii) (emphasis added).

The TCPA does not define "call," and the parties have not pointed to any interpretive order or regulation from the Federal Communications Commission that expressly interprets "call" to mean attempted facsimile transmissions.  However, the Ninth Circuit has construed the word broadly based on its dictionary definition and Congress' purpose of prohibiting invasions of privacy via unsolicited telephone communications.  *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953 (9th Cir. 2009) (noting that "call" is defined as "to communicate with try to get into communication with a person by a telephone," and construing the term to include text messages).  Similarly, the FCC has held that "the plain language of section 227(b)(1)(A)(iii) prohibits the use of autodialers to make any call to a wireless number . . . this prohibition applies *regardless of the content of the call*, and is not limited only to calls that constitute 'telephone solicitations.'"  *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 565 (2008) (emphasis added).  This broad interpretation is buttressed by Congress' use of the word "*any* call," § 227(b)(1)(A) (emphasis added).  *See also Definition of "any"*,

---

[5] Regal also contends that § 227(b)(1)(C) does not apply because that subsection prohibits only the sending of advertisements, which Regal's faxes were not.  (SUF 8.)  Plaintiff does not dispute that the faxes are not advertisements, and thus subsection (b)(1)(C) does not apply.  (*Id.*)

Merriam-Webster's                 Dictionary,                 https://www.merriam-webster.com/dictionary/any?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited Jan. 2, 2017) (defining "any" in part as "unmeasured or unlimited in amount, number, or extent; appreciably large or extended").

Given this broad interpretation, the Court concludes that an attempt to send a facsimile transmission to a cellphone constitutes a "call" within the meaning of the TCPA. A fax transmission is simply a telephone call that contains data rather than spoken word. And, like a traditional phone call, that data is intended to express a message to the recipient through a telephone line. That the content of a fax message is decipherable only by another fax machine does not take it out of the purview of the TCPA when inadvertently[6] sent to a cellphone number. The annoyance and cost to the recipient of receiving the attempted fax is still the same.

**B.    Whether Regal Used an "Automatic Telephone Dialing System"**

The parties dispute whether Regal's fax system constitutes an ATDS. "The term 'automatic telephone dialing system' means equipment which has the capacity-- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Since Congress enacted the TCPA, however, technological advances have made this definition somewhat obsolete, for modern dialers tend to make calls from call lists rather than from self-generated numbers. *See generally Luna v. Shac, LLC*, 122 F. Supp. 3d 936, 939 (N.D. Cal. 2015). Thus, the FCC has broadly interpreted this definition to include "any equipment that has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *In the*

---

[6] The Court also notes there is no intent requirement for TCPA violations. *See Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1311 (11th Cir. 2008) ("[T]he TCPA does not require intent, except when awarding treble damages."); *Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 882 (8th Cir. 2005) ("[I]ntent is not a prerequisite to liability under the Act.").

*Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, Declaratory Ruling, 27 F.C.C. Rcd. 15,391, 15,392 n.5 (2012); *see also Sherman v. Yahoo! Inc.*, 150 F. Supp. 3d 1213, 1217 (S.D. Cal. 2015).   Instead, the FCC has emphasized that focus of the inquiry is whether the particular fax system can "'dial numbers without human intervention' and . . . 'dial thousands of numbers in a short period of time.'"   *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, ¶ 17 (2015).   While the FCC has rejected a *per se* human intervention requirement, *id.* ¶ 20, the degree of human intervention required to make the call remains the "primary consideration" in whether the system constitutes an ATDS.   *Jenkins v. mGage, LLC*, No. 1:14-CV-2791-WSD, 2016 WL 4263937, at *6 (N.D. Ga. Aug. 12, 2016).   "How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination."   30 F.C.C. Rcd. 7961, ¶ 17.   Whether a particular system constitutes an ATDS is a question of fact. *Satterfield*, 569 F.3d at 951 (reversing district court's grant of summary judgment based on "genuine issue[s] of material fact whether this telephone system has the request capacity to be considered an ATDS under the TCPA"); *Sherman*, 150 F. Supp. 3d at 1217 (denying summary judgment because "[a] reasonable jury could conclude that the Welcome text is produced and sent by an ATDS as the term is defined in the TCPA").

Regal does not argue that its faxing system does not have the "capacity" to generate random or sequential numbers.   Rather, Regal argues that the significant human intervention required to send out faxes takes it outside the definition of an ATDS.   (Mot. at 16–24.)

### 1.    80 Automatic Response Letters

The Court denies summary judgment as to these letters as there is clearly no significant human involved in the generation and sending of automatic approval

letters.  Regal's Access Express program automatically generates an approval letter for medical requests that meet certain preset criteria, which is then queued up and faxed out using an automated system.  The only human intervention is the submission of the request by the medical provider, but such intervention alone is too attenuated to conclude that these faxes were not the product of an ATDS system.  *See Sherman*, 150 F. Supp. 3d at 1217 (Yahoo user entering his cellphone number into a Yahoo database, causing him to receive automated text messages, did not constitute sufficient human intervention to warrant summary judgment).

### 2.    420 Reviewed Response Letters

While the issue is closer with respect to the reviewed response letters, a reasonable factfinder could still conclude that the process constitutes an ATDS.  There is undoubtedly human involvement in the preparation of the letter and initial decision to fax the letter to a specific medical provider, which weighs against a finding that Regal's faxing system is an ATDS.  However, because there are substantial additional automated steps required to complete the fax transmission, the Court finds summary judgment inappropriate.   A web of computer programs operate to: (1) store the provider's fax number; (2) decide whether to fax or mail the letter out; (3) select the appropriate fax number for transmission from a database of numbers; (4) decide when to attempt to fax the letter out; (5) decide whether a fax attempt was successful, and thus whether to reattempt the fax; and (6) decide how many attempts to make before giving up and mailing the letter out.  These factors set them apart from other cases granting summary judgment on this issue.  *See, e.g.*, *Jenkins*, 2016 WL 4263937, at *6 (granting summary judgment only where "direct human intervention [wa]s required to send each text message immediately or to select the time and date when, in the future, the text message will be sent"); *Luna*, 122 F. Supp. 3d at 941 (granting summary judgment where human intervention was involved in "drafting the message, *determining the timing of the message*, and clicking 'send' on the website to transmit the message to Plaintiff" (emphasis added)); *see also Sterk v. Path, Inc.*, 46 F. Supp.

3d 813, 819 (N.D. Ill. 2014) ("It is the ultimate calling from the list by the automated equipment that is the violation of the TCPA.").  This is also more than simple repeat dialing, which one court has held is insufficient to render the system an ATDS.  *See Wattie-Bey v. Modern Recovery Sols.*, No. 1:14-CV-01769, 2016 WL 1253489, at *4 (M.D. Pa. Mar. 10, 2016).  The Court therefore denies the Motion with respect to these faxes.

### 3.    26 Other Faxes

The remaining 26 faxes comprise of the 17 faxes sent by Regal's IT Department as part of a group fax, and the 9 faxes manually sent by individual Regal employees directly to Plaintiff.  Regal is not entitled to summary judgment on the 17 faxes that it sent to Plaintiff as part of a group fax.  Regal appears to suggest that the method for sending such group faxes substantially differs from the method of sending the medical service response letters, but gives no information on exactly how such group faxes are sent besides stating that it is done through XMedius.  (SUF 51.)  Moreover, the fact that these 17 faxes were sent as part of a group fax makes them more, not less, like an ATDS.  30 F.C.C. Rcd. 7961, ¶ 17 (noting that a defining characteristic of an ATDS is the ability to send multiple faxes over a short period of time).  Thus, Regal has not met its burden of showing that it is entitled to summary judgment on those 17 faxes.  However, the Court concludes that summary judgment is appropriate for the 9 faxes that Regal employees sent to XMedius directly to be faxed to Plaintiff.  In those instances, the employee had to manually enter in the recipient's fax number, and would receive a notice stating whether or not the fax was successful.  Thus, Regal's system is clearly not functioning as an ATDS system when sending such faxes.

/ / /

/ / /

/ / /

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## V.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Regal's Motion with respect to the 9 faxes that Regal employees sent directly to XMedius to be faxed to Plaintiff. The Court **DENIES** the Motion in all other respects.  (ECF No. 25.)

**IT IS SO ORDERED.**

January 9, 2017

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**